IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,          :

         Plaintiff,

         v.                                  :          Case No. 3:16-cr-157

DAMITRES WARD,                                    JUDGE WALTER H. RICE

         Defendant.               :

---

DECISION AND ENTRY OVERRULING DEFENDANT DAMITRES
WARD'S MOTION TO SUPPRESS EVIDENCE (DOC. #15); EVIDENCE
OBTAINED DURING SEIZURE MAY BE USED AGAINST DEFENDANT

---

Defendant Damitres Ward ("Defendant" or "Ward") is charged with "knowingly

possess[ing] a firearm in and affecting interstate and foreign commerce[,]" having

previously been convicted of two prior felonies, in violation of 18 U.S.C. § 922(g)(1).

Doc. #11, PAGEID #24-25.  This matter is currently before the Court on Defendnat's

Motion to Suppress Evidence ("Motion").  Doc. #15.  This Court held a hearing on same

on March 31, 2017.  For the reasons set forth below, Defendant's Motion is

OVERRULED.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 9, 2016, Defendant and his two acquaintances, Brian Harris

("Harris") and Marvin Hunter ("Hunter") (collectively the "Suspects"), were standing in

front of the Food City supermarket ("Food City") on Germantown Street in Dayton, Ohio.

The supermarket is across the street from a densely-populated housing project known

as Desoto Bass.  The housing project and the area surrounding it (collectively the

"Desoto Bass Neighborhood" or "Neighborhood")) are known to officers of the City of

Dayton Police Department ("DPD") as a "high crime area," as DPD officers had made

many arrests in that area relating to drugs, firearms and homicides.  Doc. #21, PAGEID

#55, 89.  Moreover, DPD had received numerous complaints from Neighborhood

residents about individuals loitering, and drug sales taking place, in and in front of the

Food City.  *Id.*, PAGEID #46, 55.

DPD Officers Josh Campbell ("Campbell") and Adam Sharp ("Sharp") were

patrolling the Neighborhood in a marked police cruiser on the date in question, and

passed by the supermarket several times during the day.  Campbell testified that the

Suspects were in front of the market the entire day, during which time they repeatedly

entered and exited a legally parked sport utility vehicle ("SUV") in front of Food City.

Doc. #21, PAGEID #45-46.  Campbell testified that, given the Suspects' loitering and

the prevalence of drug trafficking in the Desoto Bass Neighborhood, they were

concerned that the Suspects were trafficking drugs.  *Id.*, PAGEID #46.

At approximately 1:35 p.m., Campbell and Sharp parked their cruiser parallel to

the SUV and approached the suspects.  Gov't Ex. 1, 13:35:51.  "With Officer Sharp now

near him, Harris began to place his hand towards his pant pocket.  Upon seeing this

movement, Officer Sharp asked Harris not to do so."  Doc. #25, PAGEID #117 (citing

Ex. 1 at 13:36:03-05).  Upon request by Campbell and Sharp, all three Suspects

provided their names and identification to the Officers; Ward provided his Social

Security number to Sharp several times within the first minute of the Officers'

approaching him.  Doc. #21, PAGEID #70.  While Campbell and Sharp were

questioning the Suspects, DPD Officer Mike Orick ("Orick") parked his cruiser parallel to the black SUV, such that there was now a DPD cruiser on each side of the black SUV, and walked toward the Suspects. Ex. 1 at 13:35:54-13:36:07.  Sharp proceeded to ask Hunter about the SUV, which Hunter admitted to using but denied owning. *Id*. at 13:37:02-44.  Twice Sharp asked the Suspects whether they were using or selling drugs; twice they denied engaging in either such activity. *Id*. at 13:36:52-13:37:02, 13:37:42-48.

Sharp then posed the question, "[i]s it all right if we pat you down?" Ex. 1 at 13:37:48-51.  Defendant, Harris and Hunter all replied in the negative, and one of the suspects stated, "I know my rights." *Id*. at 13:37:51-55, 13:38:08-12.  Nonetheless, Orick frisked Hunter. *Id*. at 13:38:00-43; Doc. #21, PAGEID #94.  "After Officer Orick completed the frisk of Hunter, finding only a half-filled bottle of liquor, Officer Sharp began to walk towards Mr. Ward, stating:  'Come on over here[,] sir.'" Doc. #25, PAGEID #120 (citing Ex. 1 at 13:38:43-46).  In response, Defendant, who was standing less than ten feet from Hunter at the time Sharp began walking toward him, fled around the corner of the Food City.  Sharp and Campbell pursued the Defendant on foot; during the pursuit, the Defendant discarded a semi-automatic pistol, throwing it up in the air. After refusing to obey the Officers' commands to stop running and drop to the ground, Ward was tased and arrested. *Id*. (citing Ex. 1 at 13:38:48-52; Doc. #21, PAGEID #59-61).  After arresting the Defendant, one of the Officers retrieved the pistol discarded by the Defendant during the chase.

3

## II.    LEGAL STANDARDS

"The Fourth Amendment [to the United States Constitution] prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).  "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *reh'g denied* 448 U.S. 908, 100 S.Ct. 3051 (1980).

In *Terry*, the Supreme Court held that the Fourth Amendment is not violated when police officers temporarily detain an individual, so long as the officers have an articulable, particularized and reasonable suspicion that the individual is participating in criminal activity.  392 U.S. at 30.  The officers may only detain an individual for as long as necessary to determine whether their suspicion is justified. *Id*.  If the officers "reasonably suspect that the person stopped is armed and dangerous[,]" then, for safety purposes, they may frisk the outside of the individual's clothing to determine whether the individual is carrying a weapon on his person. *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

If a *Terry* stop is found to violate the Fourth Amendment, and the evidence at issue was obtained by the law enforcement officers' exploitation or furtherance of their Constitutionally-prohibited activity, then the exclusionary rule applies, and any such

4

evidence must be suppressed as "fruit of the poisonous tree." *U.S. v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004) (citing *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

## III.    ANALYSIS

Defendant argues that the firearm which he allegedly discarded on November 9, 2016, should be suppressed because (A) he was seized within the meaning of the Fourth Amendment at the time he did so; and (B) the Officers' seizure of Defendant was not justified under the conditions set forth in *Terry*.  Accordingly, Defendant claims the seizure violated the Fourth Amendment, and, thus, the firearm must be excluded as the fruit of the poisonous tree.

### A.    Defendant was Seized at the Time he Allegedly Discarded the Firearm

Defendant notes that, prior to his running away from the scene, DPD Officers: (1) parked two police cruisers on either side of an SUV to which he had access; (2) approached Harris, Hunter and him, and expressed skepticism at their statements that they had been "chilling" outside the Food City the entire day; (3) demanded the Suspects' names and identification numbers, and asked them twice whether they were using or selling drugs; (4) asked if the Suspects consented to being frisked; (5) frisked Hunter even after all Suspects evinced their refusal; and (6) then instructed Defendant to approach them, for the purposes of frisking him.  Doc. #22, PAGEID #102-04 (citations omitted).  Defendant argues that, under the totality of the above

circumstances, no reasonable person would have believed that he was free to leave the scene, and thus, he was seized within the meaning of the Fourth Amendment.  Doc. #15, PAGEID #29-30 (citing *Mendenhall*, 446 U.S. at 554 (plurality opinion of Stewart, J.)).

The Government concedes that Hunter was seized no later than the point at which he was patted down by Officer Sharp.  Doc. #25, PAGEID #125.  However, the Government notes that the seizure of Hunter does not constitute a vicarious seizure of Defendant simply because they were in the same vicinity, and that at no point during the pat-down of Hunter did any Officer approach or interact with Ward.  *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 137, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)); *see also* Ex. 1 at 13:38:00-43).  Further, the Officers never activated their lights or sirens on their cruisers, brandished their weapons, or told the Suspects not to move, *id.*, PAGEID #123-24 (citing *Mendenhall*, 446 U.S. at 554; *U.S. v. Pettis*, No. 14-3341, 591 F. App'x 393, 397 (6th Cir. 2014); *U.S. v. Preston*, No. 13-2514, 579 F. App'x 495, 497-99 (6th Cir. 2014)), and even though they asked the Defendant for his name and Social Security number, they did not attach a threat of sanction to those questions (*e.g.*, "you cannot leave until and unless you provide your name and produce a form of identification.").  *Id.*, PAGEID #124 (citing *U.S. v. Campbell*, 486 F.3d 949, 956-57 (6th Cir. 2007)).  In light of the above, and that in all the cases cited by the Government, the Courts held that the defendant was not seized within the meaning of the Fourth Amendment, the Government argues that, prior to Officer Sharp telling the Defendant "come over here, sir," the encounter between the Defendant and the DPD Officers was consensual, and thus, not a seizure.  Doc. #25, PAGEID #126.

Finally, they argue that Officer Sharp's command to Defendant cannot constitute a seizure, because the Defendant never submitted to Sharp's authority. *Id.*, PAGEID #126 (citing *California v. Hodari D.*, 499 U.S. 621, 627, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).  In light of the above, the Government claims, Defendant was never seized prior to being tased, which occurred after he dropped the firearm at issue. Consequently, it argues, the firearm was not obtained as part of an unconstitutional seizure of the Defendant, and should not be excluded as fruit of the poisonous tree.

The Court recognizes that "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry," *Mendenhall*, 446 U.S. at 554, and that, as the Government notes, law enforcement officials may ask certain questions of civilians without implicating the Fourth Amendment.  Doc. #25, PAGEID #121-22 (citations omitted).  Nonetheless, the Officers' frisking of Hunter, after all three Suspects evinced refusal to consent, indicated that all Suspects would be frisked against their will; consequently, a reasonable person in Defendants' shoes would have believed that he would not be free to leave. *Mendenhall*, 446 U.S. at 554.  Thus, no later than the moment at which the Officers began patting down Hunter, the Defendant was seized within the meaning of the Fourth Amendment.  Moreover, and unlike in *Hodari D.*, the Defendant initially acquiesced to the Officers' show of authority by remaining in front of Food City during the frisk of Hunter.  As Defendant was seized at the time he discarded the firearm, the firearm must be suppressed unless the seizure was lawful.

### B.    Seizure of Defendant was Constitutional

In *Johnson*, the Supreme Court described the requirements for a *Terry* "stop and frisk" to be considered constitutionally permissible:

7

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

555 U.S. at 326-27.  Campbell testified that the Officers had not received any complaints concerning the Suspects, and that prior to asking whether the Suspects consented to being frisked, Campbell had observed nothing to suggest that any of the Suspects was armed.  Doc. #22, PAGEID #105 (citing Doc. #21, PAGEID #67, 71).  Moreover, while the Desoto Bass neighborhood is a high crime area, merely being present in such an area is not sufficient to justify a *Terry* stop.  *Id*., PAGEID #106 (citing *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).  "The only other justification offered was that Mr. Hunter had previously [and repeatedly] entered and exited" the black SUV," a justification which Defendant claims falls well short of "reasonable suspicion that Mr. Ward and his friends were committing or had committed a criminal offense." *Id*.  Accordingly, Defendant argues, neither the stop nor the frisk of the Suspects satisfied the Fourth Amendment, and the firearm at issue must be suppressed as the fruit of the poisonous tree.

It is undisputed that the Suspects' presence in the Desoto Bass Neighborhood, by itself, would not constitute the reasonable suspicion necessary for the Officers to conduct a *Terry* stop.  However, as the Government notes, the Officers had much more information which, in the aggregate, justified their reasonable suspicion that the Suspects were engaged in criminal activity.  Doc. #25, PAGEID #127 (citing *U.S. v. Martin*, 289 F.3d 392, 398 (6th Cir. 2000)).  Those factors included, but were not limited to:  (1) observing the suspects loitering in front of Food City for several hours; (2) having

8

received complaints from residents of the Desoto Bass Neighborhood about drug activity in and in front of Food City; and (3) observing the Suspects repeatedly entering and exiting the SUV, which was a "common hallmark[] of drug trafficking activity that they had observed in this area." *Id*., PAGEID #127-28.

Moreover, less than three minutes elapsed between when Officers Campbell and Sharp approached the Suspects and Defendant's decision to run away from the Food City.  Ex. 1 at 13:35:51-13:38:48.  Thus, even assuming *arguendo* that Defendant was seized as soon as Campbell and Sharp parked their cruiser next to the SUV, the stop was not of unreasonable duration.  Further, although not addressed by the parties, it was reasonable for the Officers to suspect that, if Defendant, Harris and Hunter were trafficking drugs in an open area, that they may be carrying weapons.  Thus, frisking the Suspects, even absent their consent, was reasonable to ensure officer safety, and once the Defendant abandoned the firearm by discarding it in plain view of the Officers, the Officers were within their rights to seize the weapon.

Accordingly, the Officers' seizure of Defendant was constitutionally permissible under the Fourth Amendment and *Terry*, and the firearm allegedly discarded by Defendant during his flight will not be suppressed.

## IV.    CONCLUSION

For the reasons set forth above, the Court OVERRULES Defendant Damitres Ward's Motion to Suppress.  Doc. #15.  The evidence seized by DPD Officers may be used against him at trial.

Date: July 20, 2017

_____

WALTER H. RICE
UNITED STATES DISTRICT JUDGE